*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 12**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

DOUGLAS STEWART CARTER,
*Appellant*,

*v.*

STATE OF UTAH,
*Appellee.*

No. 20170641
Filed March 21, 2019

On Direct Appeal

Fourth District, Utah County
The Honorable Lynn W. Davis
No. 150400825

Attorneys:

Loren E. Weiss, Salt Lake City; Jon M. Sands, Paula K. Harms,
Eric Zuckerman, Phoenix, for appellant

Andrew F. Peterson, Erin Riley, Daniel W. Boyer, Asst. Solics. Gen.,
Salt Lake City, for appellee

JUSTICE HIMONAS authored the opinion of the Court in which
JUSTICE PEARCE, JUSTICE PETERSEN, JUDGE MORTENSEN, and
JUDGE POHLMAN joined.

Having recused themselves, CHIEF JUSTICE DURRANT and
ASSOCIATE CHIEF JUSTICE LEE did not participate herein.
COURT OF APPEALS JUDGE DAVID N. MORTENSEN
and COURT OF APPEALS JUDGE JILL M. POHLMAN sat.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶1 For over three decades Douglas Carter has been on death row for the brutal murder of Eva Olesen. A jury convicted Carter in 1985 of murdering Ms. Olesen based in no small measure on the testimony of Epifanio and Lucia Tovar. Shortly after the Tovars

testified against Carter at the guilt phase of his trial, they vanished. A separate jury sentenced Carter to death based, again, in no small measure on the Tovars' prior trial testimony, which had to be read to the jury in light of the Tovars' absence.

¶2 Through a coincidence, Carter's current counsel located the Tovars in 2011. After interviewing them, counsel obtained their sworn declarations. In these declarations the Tovars assert under "penalty of perjury" that (1) they were threatened by police with deportation, the removal of their son, and prison if they did not cooperate in the case against Carter, (2) they felt pressured to make untrue statements, and (3) they were explicitly instructed to lie under oath about substantial financial benefits provided to them by the police and previously undisclosed to defense counsel.

¶3 With these damning revelations in hand, Carter's counsel filed a petition for post-conviction relief, which the State responded to with a motion for summary judgment. Despite finding the existence of genuine disputes of material fact regarding whether the police or prosecution "threatened . . . the Tovars," "coached the Tovars' testimony," and suborned perjury by telling Mr. Tovar "to lie about benefits he received from the State," the district court summarily dismissed Carter's petition on the grounds that, as a matter of undisputed fact and law, Carter was not prejudiced by this conduct at either the guilt or sentencing phases of his trial.

¶4 Because the district court erred in this determination, we reverse and remand for an evidentiary hearing consistent with this opinion.

## BACKGROUND[1]

### *Murder of Eva Olesen*

¶5 On February 27, 1985, Orla Olesen found his wife, Eva, murdered in their Provo, Utah home. Ms. Olesen's hands were tied behind her back, her clothes had been removed from the waist down, and her sanitary pad had been removed and was lying at her feet. She had been stabbed eight times in the back, once in the abdomen, and once in the neck. She had also suffered a fatal gunshot wound to the back of her head.

¶6 A specialist from the Bureau of Alcohol, Tobacco, and Firearms determined that the markings on the slug removed from her body were consistent with those produced by a .38 special handgun. The gun used to kill Ms. Olesen was never located. The knife used to inflict the stab wounds was recovered at the scene and determined to have come from the Olesens' kitchen. Detectives also recovered nineteen fingerprints and a blonde pubic hair from the scene. None of the physical evidence linked Carter to the scene of the crime.

---

[1] When reviewing a grant of summary judgment we recite all facts in favor of the nonmoving party—in this case, Carter. *See, e.g.*, *Poteet v. White*, 2006 UT 63, ¶ 7, 147 P.3d 439. We also draw all reasonable inferences in favor of the nonmoving party. *Id.*

We also wish to bring to the reader's attention a stylistic choice regarding how statements and testimony are recounted in this section. When describing statements and testimony in this section, we have opted to forego prefacing every statement or piece of testimony with something akin to "according to this witness" or "this witness said." Instead, we provide such a preface at the beginning of that witness's testimony and often proceed to describe the remainder of the testimony without any such preface.

By way of example, in recounting Anne Carter's statement to police in paragraph 11, we state:

> In her statement to police, Ms. Carter reported that Carter had gone to visit his friend, Epifanio Tovar, on the night of the murder. While at Mr. Tovar's house, Carter also met two of Mr. Tovar's friends. One of these friends held a grudge against Provo Police Chief Swen Nielsen, who was Ms. Olesen's nephew.

The second and third sentences are not to be read as a declaratory statement of fact made by this court. Instead, those sentences simply reflect what Ms. Carter said in her police interview.

*Initial Investigation of Carter*

¶7    On March 14, 1985, Provo Police brought Carter in for questioning on the basis of two independent tips. First, an eyewitness had identified Carter as a possible suspect in a separate case—a vehicle trespass that had occurred an hour or two prior to the murder in the same general area. Second, police had received information that Anne Carter—Carter's wife at the time, but who was contemporaneously seeking a divorce from Carter—had told someone that she rushed home after learning of the murder to see if Carter had been involved. During questioning, Carter admitted that he knew Ms. Olesen—who had purchased health care products from Anne in the past—but denied involvement in the murder. Carter was fingerprinted and released.

¶8    On March 20, 1985, police brought Carter in for a second round of questioning regarding the murder. Police told Carter that they had brought him in for further questioning because of some discrepancies between his and Anne's statements. Carter maintained his truthfulness and gave police permission to take hair samples to compare with those found at the scene. At the time of this second interview, Carter was one of about eight suspects in the murder.

*Anne Carter's Statement to Police*

¶9    On April 8, 1985, Ms. Carter approached Deputy Utah County Attorney Sterling Sainsbury, who she knew through her position as a clerk for the juvenile court, and told him that she thought Carter had been involved in the murder. Ms. Carter suspected that her missing handgun, a .38 special, was the murder weapon and she was afraid that she would be implicated as an accessory to the crime. Mr. Sainsbury informed her that he was obligated to report her story to the Utah County Attorney's Office and he recommended that she obtain legal counsel and come forth with the information voluntarily. Mr. Sainsbury then sought out the prosecutor assigned to the murder, Utah County Deputy Attorney Wayne Watson, and relayed Ms. Carter's statements to him.

¶10    Ms. Carter sought advice from Robert Orehoski, who was representing her in her divorce action against Carter. Mr. Orehoski, who coincidentally happened to be Mr. Watson's private law partner, recommended that she seek a conditional grant of immunity in exchange for her information. Ms. Carter decided to give a statement to police and agreed to a search of her home, during

which police recovered several articles of bloodstained clothing[2] and .38 caliber ammunition.

¶11   In her statement to police, Ms. Carter reported that Carter had gone to visit his friend, Epifanio Tovar, on the night of the murder. While at Mr. Tovar's house, Carter also met two of Mr. Tovar's friends. One of these friends held a grudge against Provo Police Chief Swen Nielsen, who was Ms. Olesen's nephew. Carter and the two friends decided to go to the Olesens' house and steal Ms. Olesen's gold necklace. Carter waited in the car while the other two men knocked on the door and entered the house. Carter was unaware of what happened in the house until the two men returned to the car and told him that Ms. Olesen was dead.

*Perla Bermudez Interview*

¶12   Based on the information provided by Ms. Carter, police next interviewed Perla LaCayo Bermudez on April 10, 1985.[3]

---

[2] Because we believe it important to our prejudice analysis, we reiterate that no physical evidence linked Carter to the crime scene. For example, the record reflects that the blood on the clothing recovered during the search of the home was not Ms. Olesen's.

[3] There are some significant concerns with this interview that must be noted. First, the transcript begins with the interviewer, Officer Richard Mack, telling Ms. Bermudez, "I know that you already told me all of [this], but we need to repeat[] it for the recorder. Okay?" This makes clear that the information contained in the transcript is not from the initial interview with Ms. Bermudez, but instead recounts what took place in that initial interview.

Second, it appears that the interview takes place over several days, but it is unclear from the transcript where one interview ends and another begins. While the transcripts of the interview are marked as being recorded on April 10, 1985, it seems obvious from the record that the interview did not occur entirely on April 10, 1985. At several points, the record demonstrates that Ms. Bermudez was brought in for multiple interviews. A supplementary report states that Officer Mack was "requested to *reinterview* [Ms. Bermudez] to see if any more information could be determined as to the whereabouts of [Carter]." This is corroborated by another supplementary report from Officer Mack on April 12, 1985, that begins: "Today I *again* made contact with [Ms. Bermudez]." It is also worth noting that the discussion between tapes is not continuous

(continued . . .)

Ms. Bermudez was friends with Carter and Mr. Tovar and had seen both of them in the days prior to her interview. Ms. Bermudez told police that Carter had been acting strange in the month prior and that he had told her that he was a suspect in Ms. Olesen's murder. Carter said he planned to leave for Chicago and gave Ms. Bermudez a portable whirlpool used to heat up water as a parting gift. When she tried to use the whirlpool, it began smoking; she opened the whirlpool to reveal a gun wrapped in some kind of rag or t-shirt. Carter later returned to retrieve the whirlpool. A few days later, Ms. Bermudez and Mr. Tovar drove Carter just across state lines to Wendover, Nevada to catch a bus to Chicago.

¶13     When asked whether Mr. Tovar knew that Carter was a suspect in the murder, Ms. Bermudez initially responded that she did not think Mr. Tovar knew anything. However, Ms. Bermudez later changed course and offered that Mr. Tovar told her that Carter had confessed to him about the murder.[4] Mr. Tovar told her that Carter had gone to Ms. Olesen's house and forced his way inside. Ms. Olesen grabbed a knife from the kitchen, but then dropped it when Carter told her to let go of it. Carter instructed Ms. Olesen to lie down on the floor, where he pulled her pants down. Carter then stabbed Ms. Olesen in the back and shot her through a pillow.

---

and features significant gaps in the conversation, which make it difficult to demarcate where the different interviews begin and end.

The transcript also suggests that Ms. Bermudez spoke to Mr. Tovar between interviews and told him that the police may ask more questions of both her and Mr. Tovar. She told Mr. Tovar that "if they ask—ask me again—I even told him, Epifanio, I said, if they come here, I said, say the truth instead." Because of these inconsistencies, it is difficult to establish a clear timeline with respect to the interactions between the police and Ms. Bermudez and between Ms. Bermudez and Mr. Tovar.

[4] This portion of the transcript probably comes from one of the interviews that were taken after the initial interview with Officer Mack, as this statement indicates a clear reversal from her prior statement that Mr. Tovar did not know anything. A supplementary report dated April 12, 1985, suggests this is the case, as Officer Mack noted "I told [Ms. Bermudez] that she had to know more about [Mr.] Tovar's involvement in this entire situation. She admitted that she did."

¶14    Mr. Tovar told Ms. Bermudez that he was afraid of Carter and what Carter might do to his family. Mr. Tovar also told her that he was not sure if he believed Carter because Carter lied a lot.

*Epifanio Tovar's Police Interview*

¶15    As a result of the interview with Ms. Bermudez, police felt they had probable cause to take Mr. Tovar into custody for obstruction of justice. Mr. Tovar was taken into custody on April 12, 1985.[5] That same day, Provo Police Lieutenant George Pierpont conducted an interview with Mr. Tovar, who eventually provided a similar version of the story that Ms. Bermudez had told.[6]

¶16    Mr. Tovar initially denied any knowledge of the murder. When Mr. Tovar denied knowledge, Lieutenant Pierpont asked, "Are we going to tell each other the truth today?" Lieutenant Pierpont later added, "I want the truth. And if you do not tell me the truth—don't get yourself buried my friend." Mr. Tovar continued to deny knowledge of the murder and told Lieutenant Pierpont that he was afraid something might happen to him. Lieutenant Pierpont responded that if Mr. Tovar talked to him, he would be able to tell Mr. Tovar whether anything was going to "come down on" Mr. Tovar, but told Mr. Tovar, "I know what's already happened, I need to hear that from you," and "you've got to tell me what's happened in this thing, and you know." Mr. Tovar replied, "Okay, okay. [Carter] told me that he homicide a lady."

¶17    According to Mr. Tovar, Carter was at Mr. Tovar's house on the night of the murder and left around 7:30 pm to "go and try to steal some money." Carter returned to Mr. Tovar's house a couple hours later and appeared visibly shaken. Carter told Mr. Tovar that he had killed Ms. Olesen. Carter had gone to the Olesens' house and

---

[5] According to his testimony at trial, Mr. Tovar was held in custody for four days. The timeline is not entirely clear from the record, but it appears that Mr. Tovar was first interviewed and then held in jail for four days.

[6] It appears from the transcript that this was not the first time Lieutenant Pierpont and Mr. Tovar had talked to each other. At the beginning of the interview, Lieutenant Pierpont tells Mr. Tovar, "The reason you're here is because of a friend of yours. . . . I'm sure you saw me the other day up there, and I saw you *and we talked for a minute*." It is unclear exactly what encounter Lieutenant Pierpont is referring to, but it is clear that there was a previous encounter— however brief it may have been.

knocked on the door. When Ms. Olesen answered the door, Carter felt that the look she gave him showed that she viewed him with prejudice because he was Black. Carter became angry, pointed a gun at Ms. Olesen, and told her to get inside the house. Ms. Olesen grabbed a kitchen knife, but she dropped the knife at Carter's direction and laid down on the floor. Carter then proceeded to repeatedly stab Ms. Olesen in the back with the knife. Ms. Olesen was still alive after Carter stabbed her repeatedly, so he grabbed a pillow to muffle the sound and shot Ms. Olesen in the back of the head. Carter took nothing from the home and took care to leave behind no fingerprints.

¶18 The following day, Mr. Tovar watched the news and read the paper, which confirmed Ms. Olesen's murder. In doing so, Mr. Tovar read that Ms. Olesen had been raped. When Mr. Tovar saw Carter again, Mr. Tovar asked him if he had raped Ms. Olesen. According to Mr. Tovar, Carter replied that he did not rape Ms. Olesen and that he pulled her pants down but she was "on the rag." Carter also told Mr. Tovar that he might dispose of the gun by throwing it in a lake, but Mr. Tovar denied knowledge of the actual whereabouts of the gun.

¶19 Mr. Tovar also disclosed that he had helped drive Carter to Wendover to catch a bus out of the state, although he was uncertain exactly where Carter was headed.

*Carter's Arrest and Confession*

¶20 A warrant was issued for Carter's arrest and the State filed an information charging Carter with capital murder. Carter was eventually located on June 11, 1985, in Nashville, Tennessee, where he was arrested and taken into custody. Carter was interrogated that day by Officer William Cunningham of the Nashville Police Department. Carter was questioned for about four hours on June 11 and four more hours on June 12. During the interview, Carter was "inquisitive" and "asked numerous times" what had happened to JoAnn Robins, a woman he had befriended and whose home he was in at the time of his arrest. Officer Cunningham informed Carter that she had been arrested and charged as an accessory after the fact for harboring a fugitive. Over the course of the two-day interrogation, Carter repeatedly insisted that Ms. Robins knew nothing about the murder of Ms. Olesen. Carter made no incriminating statements to Officer Cunningham.

¶21 The following day, Lieutenant Pierpont arrived in Nashville and took over the interrogation. Within about thirty minutes, Lieutenant Pierpont was able to extract a confession in

which Carter admitted to entering the Olesens' home, stabbing Ms. Olesen, and shooting her in the back of the head. The confession also states that Carter went around the house looking for things to steal. Notably, Carter's confession does not mention anything about removing Ms. Olesen's clothes.

¶22    Carter's counsel filed a motion to suppress the confession, contending that his confession was coerced. Carter claimed to have seen Ms. Robins in the jail while he was being held there. Carter also claimed that Officer Cunningham promised to help Ms. Robins if Carter would help him. According to Carter, Officer Cunningham repeated this promise every time that Carter asked about Ms. Robins. Counsel also raised concerns regarding the procedure by which his confession was obtained. The confession was dictated by Lieutenant Pierpont to a tape recorder[7] and a secretary later typed up what Lieutenant Pierpont had dictated.[8] Lieutenant Pierpont would pause intermittently to ask Carter whether what he was saying was accurate. After the statement was typed up, Carter reviewed the statement and signed it.[9] The trial court rejected the motion to suppress and this court later affirmed, noting that Carter's "own detailed statements to [*the Tovars*] immediately after the crime parallel and substantially support the confession given to the police." *State v. Carter*, 776 P.2d 886, 890 (Utah 1989) (emphasis added).

*Preliminary Hearing Testimony*

¶23    On June 25, 1985, the court held a preliminary hearing at which Mr. Tovar and his spouse, Lucia Tovar, among others, testified.

---

[7] The tape was never brought to Utah from Tennessee and was apparently destroyed at some point between the dictation of the confession and Carter's trial.

[8] The typist listed on the confession, Julie Hoffman, has stated that this confession does not appear to her to have been taken and dictated in the usual manner of that time period. Ms. Hoffman declares that she would usually type a suspect's words as the suspect was interviewed, and that the interview would be recorded on a tape, which was kept as evidence.

[9] Carter testified that while his signature appears on the confession presented at the preliminary hearing, it was a different document than the one he signed in Nashville.

¶24   Mr. Tovar gave testimony similar to the statement he gave to police on April 12, 1985. Mr. Tovar recounted Carter telling Mr. Tovar that he was going to go out and break into a car or steal some money, but when he returned he admitted to killing Ms. Olesen. Mr. Tovar also recalled Carter telling Mr. Tovar in a subsequent conversation that he did not rape Ms. Olesen. Mr. Tovar did offer some information that was absent from his April 12 statement. Specifically, Mr. Tovar testified that Carter demonstrated the act of the murder by lying on the ground and showing Mr. Tovar how he stabbed Ms. Olesen.

¶25   Ms. Tovar also testified at the preliminary hearing. Speaking through a translator, Ms. Tovar testified that she observed the conversation between Carter and her husband on the night of February 27. She stated that she understood very little of the conversation that took place, but she observed Carter's physical demonstration. Carter demonstrated lying down with his hands behind his back and then signaled that he was shooting someone.

*1985 Trial Testimony*

¶26   At trial, the State again called Mr. and Ms. Tovar to testify. Mr. Tovar provided testimony similar to the testimony he gave during his initial police interview and at the preliminary hearing with two noteworthy exceptions. First, Mr. Tovar testified that Carter told Mr. Tovar that he intended to "*rape, break, and drive*" when he left the Tovars' home around 7:30 pm on February 27. Second, Mr. Tovar testified that he had disposed of Ms. Carter's gun in a nearby river at Carter's request. Mr. Tovar apparently disclosed this information to police one week before the trial and acknowledged on cross-examination that he had lied in his earlier statements when he denied knowledge of the gun's whereabouts. On cross-examination, Mr. Tovar also testified that he and his family had not received any support from the prosecutor's office or the Provo Police between February and trial besides the fourteen-dollar witness fees he and his wife received.

¶27   Ms. Tovar, again speaking through an interpreter, presented a more detailed version of the events she testified to at the preliminary hearing. She testified that Carter showed her and her husband exactly how he had forced Ms. Olesen to lie down, that he put his hands behind his back to illustrate how he had tied Ms. Olesen's hands, and that he demonstrated what can be best described as a stabbing motion. She also testified that Carter "laughed and laughed" about something he had done. She said that Carter was "*laughing and giggling*" while on the ground

demonstrating what he had done. On cross-examination, Ms. Tovar downplayed the possibility that Carter had been laughing at a television show playing in the Tovars' living room because what he was demonstrating and what he was laughing about seemed to have no relation to the television.

¶28    The jury found Carter guilty of first-degree murder and sentenced him to death the following day. Carter appealed his conviction and sentence. We vacated his death sentence and remanded for a new penalty proceeding because of an instructional error at the original sentencing. *State v. Carter*, 776 P.2d 886, 896 (Utah 1989).

### *1992 Resentencing Testimony*

¶29    Before Carter's resentencing, the Tovars disappeared. The State maintained that the Tovars were unavailable to testify at resentencing because they had fled the country. Accordingly, the State proposed to introduce an abstract that contained all testimony by either party at the original guilt and sentencing phases—including the Tovars' testimony. The resentencing court denied Carter's motion to exclude the abstract and portions of the Tovars' testimony were read to the jury at resentencing. Among the portions read to the jury was Mr. Tovar's testimony stating that Carter intended to "*rape, break, and drive*" and Ms. Tovar's testimony that Carter "*laugh[ed] and giggl[ed]*" while demonstrating how he had killed Ms. Olesen. The State repeated these statements in its closing argument to demonstrate why it felt the death penalty was appropriate in this case. The jury sentenced Carter to death.

### *The Tovars Resurface*

¶30    In 2011, Carter's counsel caught word that the Tovars' son had been arrested in Arizona; he agreed to speak with Carter's counsel. Through these conversations, Carter's counsel was able to locate the Tovars. The Tovars executed declarations describing their treatment by Provo Police in the months leading up to Carter's trial.

¶31    Mr. Tovar declared that he felt pressured "before, during and after" his interrogation and that he was told things "would go badly" for him if he did not cooperate. He claims that he feared for the welfare and safety of his family due to police threats that included deportation and removing the Tovars' infant son from their custody. He also declared that the police twice moved his family to a different apartment and paid the Tovars' rent, which was somewhere in the neighborhood of $400 per month. The police also paid Mr. Tovar's phone and utility bills and would deliver groceries to the Tovars. Once trial concluded, these payments stopped.

Mr. Tovar states that the police told him and his wife not to say anything at trial about the payments for rent and other living expenses if asked about benefits received from the police.

¶32    Ms. Tovar declared that she was not focused on the conversation that took place between Carter and her husband on the night of the murder and that her testimony at trial was sourced from what her husband had told her after the interaction. She also echoed Mr. Tovar's claims that the police moved them to new apartments and paid the Tovars' rent and utility bills, and that police instructed them not to acknowledge this arrangement if asked at trial. Additionally, the police would send the Tovars gifts such as food baskets or toys for their son, and on Christmas Day the police came caroling at the Tovars' apartment and delivered a Christmas tree. Furthermore, both of the Tovars assert that the prosecutor spoke with them before trial and told them what he wanted them to say in their testimony, and the Tovars felt they had no choice but to comply in light of the threats of deportation and separation.

¶33    The Tovars' claims of financial support are at least partially corroborated in two declarations from former members of the Provo Police Department who worked on the Olesen case. Officer Richard Mack declared that it was his responsibility to keep the Tovars happy and that he recalls bringing them groceries, Christmas gifts, and toys for their son. While Officer Mack does not recall giving the Tovars money for rent, he could not definitively say that he did not give them money for rent at some point. Officer Mack also noted that the police did make cash payments to witnesses in certain cases such as narcotics cases. Officer Stan Eggen also declared that, although he was not privy to the specifics of what was done for the Tovars, he does remember that the department assisted the Tovars once they were identified as witnesses.

*Wayne Watson Deposition*

¶34    Wayne Watson, the prosecutor in the original trial, was deposed in this case. When asked if it was possible that benefits were given to witnesses but not recorded in the State's file, Mr. Watson volunteered that he believed Provo City gave the Tovars "rent for a month or two." Mr. Watson claims that he learned this information from Lieutenant Pierpont but could not remember if he learned this information before or after trial. However, Mr. Watson subsequently stated that Carter's trial counsel was informed about the benefits allegedly supplied to the Tovars. When pressed on why he did not correct the Tovars' testimony that they received only the fourteen-dollar witness fee, Mr. Watson answered that he must not have

known the exact amount of the benefits the Tovars received and that he would have assumed Carter's counsel was going to bring up the other benefits later on.

*District Court Proceedings*

¶35    Carter's federal court habeas proceedings were stayed so he could return to the Utah state courts to exhaust his claims regarding the Tovars. *See Carter v. Crowther*, No. 2:02-CV-326 TS, 2016 WL 843273, at *3 (D. Utah Mar. 1, 2016). Carter raises three grounds in his petition for post-conviction relief. First, Carter argues that prosecutors suppressed or failed to disclose material impeachment information regarding the treatment of the Tovars in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Second, Carter argues that Mr. Watson failed to correct the false testimony of Mr. Tovar in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). And third, Carter argues that the prosecution improperly vouched for the Tovars at trial. The State moved for and the district court granted summary judgment on all three claims.

¶36    With respect to the first claim, the district court held that prosecutors failed to disclose material impeachment information but that the failure to disclose was not material for purposes of *Brady* and Utah's Post-Conviction Remedies Act (PCRA). With respect to the second claim, the district court held that any alleged prosecutorial misconduct was not material for purposes of the PCRA. Finally, with respect to the third claim, the district court held that it was procedurally barred because the basis for a claim of improper vouching was known at the time of trial and existed completely independent of defense counsel's knowledge of the treatment of the Tovars. Carter appeals the district court's grant of summary judgment.

¶37    Carter also appeals a number of evidentiary rulings made by the district court in connection with its consideration of his petition for post-conviction relief.

¶38    We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(i).

## STANDARD OF REVIEW

¶39    "Summary judgment is only appropriate if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Arnold v. Grigsby*, 2018 UT 14, ¶ 8, 417 P.3d 606 (citation omitted) (internal quotation marks omitted). "We review the district court's grant or denial of summary judgment for correctness, drawing all

reasonable inferences from the facts in the light most favorable to the nonmoving party." *Truck Ins. Exch. v. Rutherford*, 2017 UT 25, ¶ 5, 395 P.3d 143.

¶40 "With regard to the admission of evidence, most decisions involve a threshold statement of the legal principle governing admission or exclusion, findings of facts pertinent to a determination, and the application of the legal principle to the facts at hand with regard to admissibility." *Arnold*, 2018 UT 14, ¶ 9. "We review the legal questions to make the determination of admissibility for correctness. We review the questions of fact for clear error. Finally, we review the [trial] court's ruling on admissibility for abuse of discretion." *Id.* (alteration in original) (citation omitted) (internal quotation marks omitted).

## ANALYSIS

¶41 Carter presents a number of arguments on appeal. First, Carter argues that the district court erred in granting summary judgment in favor of the State with regard to his *Brady* and *Napue* claims. Second, Carter argues that the district court improperly dismissed his improper vouching claim as procedurally barred. And finally, Carter disputes a number of evidentiary rulings made by the district court.

¶42 We agree with Carter that the district court erred in granting summary judgment in favor of the State with regard to his *Brady* and *Napue* claims. Instead we hold that Carter has demonstrated that a genuine dispute of material fact exists as to whether he was prejudiced by both the *Brady* and *Napue* material. We therefore reverse and remand for an evidentiary hearing on these claims.

¶43 We disagree with Carter with regard to his improper vouching claim and hold that the district court correctly determined that it was procedurally barred. We also affirm the district court's numerous evidentiary rulings.

¶44 We begin our discussion of Carter's claims with an overview of the operative provisions of the PCRA. We then turn to his *Brady* and *Napue* claims, addressing each one in turn. Next, we address his improper vouching claim. And finally, we address the evidentiary rulings made by the district court and disputed by Carter on appeal.

## I. PCRA OVERVIEW

¶45 The PCRA establishes the sole statutory "remedy for any person who challenges a conviction or sentence for a criminal offense and who has exhausted all other legal remedies . . . ." UTAH CODE § 78B-9-102(1)(a). A person challenging a conviction or sentence under the PCRA may file a post-conviction petition requesting that the court modify or vacate the conviction or sentence on the ground that "the conviction was obtained or the sentence was imposed in violation of the United States Constitution or Utah Constitution." *Id.* § 78B-9-104(1)(a). The court may grant relief from a conviction or sentence only if "the petitioner establishes that there would be a reasonable likelihood of a more favorable outcome in light of the facts proved in the post-conviction proceeding." *Id.* § 78B-9-104(2). In other words, a court may grant post-conviction relief if a petitioner demonstrates that his or her conviction or sentence was obtained in violation of the United States Constitution or Utah Constitution and there is a reasonable likelihood that he or she would have obtained a more favorable outcome had that constitutional violation not occurred.

¶46 Carter alleges that his conviction was obtained and his sentence was imposed in the face of two constitutional violations. First, Carter asserts that the prosecution failed to disclose material impeachment information regarding the treatment of the Tovars in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Second, Carter asserts that the prosecution failed to correct the false testimony of Mr. Tovar with respect to financial benefits received by the Tovars in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).

¶47 The district court held that Carter's *Brady* and *Napue* claims did not qualify for relief under the PCRA because neither claim established a reasonable likelihood that Carter would have obtained a more favorable outcome had the violations not occurred. We disagree with the district court and hold that a genuine dispute of material fact exists as to whether Carter's *Brady* and *Napue* claims establish a reasonable likelihood that Carter would have obtained a more favorable outcome had the violations not occurred. We now address these claims in turn.

## II. CARTER'S *BRADY* CLAIMS

¶48 The United States Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The duty to

disclose favorable evidence extends to both exculpatory and impeachment evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985), and exists regardless of whether the accused has requested the evidence, *United States v. Agurs*, 427 U.S. 97, 107 (1976). Furthermore, the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

¶49    The Court has identified three necessary components to establish a *Brady* violation: (1) "[t]he evidence at issue must be favorable to the accused;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently;" and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

¶50    To demonstrate prejudice under *Brady*, the accused must show that the suppressed, favorable evidence is material. *Tillman v. State*, 2005 UT 56, ¶ 29, 128 P.3d 1123. Such evidence is material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. In deciding whether evidence is material for purposes of *Brady*, there are three principles that deserve "special emphasis." *Tillman*, 2005 UT 56, ¶ 30.

¶51    First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. Instead, to determine whether a "reasonable probability" of a different result exists, the relevant inquiry is whether the accused "received a fair trial, understood as a trial resulting in a verdict worthy of confidence" in the absence of disclosure of the evidence. *Id.* In other words, "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678).

¶52    Second, "materiality . . . is not a sufficiency of evidence test." *Id.* The accused does not have to discount the inculpatory evidence presented at trial by the value of the undisclosed evidence and then demonstrate that there would not have been enough evidence left to convict. *Id.* at 434–35. Rather, the accused only needs to show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

¶53 And third, "materiality ... must be evaluated in the context of the entire record." *Tillman*, 2005 UT 56, ¶ 32. While courts may "evaluate the tendency and force of the undisclosed evidence item by item," it is the collective weight of the evidence that is considered when evaluating materiality. *Kyles*, 514 U.S. at 436 & n.10.

¶54 Carter presents three pieces of suppressed evidence that he claims amount to a *Brady* violation: (1) evidence of financial benefits provided to the Tovars; (2) evidence that the prosecutor "coached" the Tovars' testimony; and (3) evidence that the police threatened the Tovars and ordered them to lie about the financial benefits they received. The district court found that there was a genuine issue of material fact with respect to whether these three pieces of evidence are favorable. The district court also found that there was a genuine dispute of material fact with respect to whether the police or prosecution had suppressed this evidence. After finding those disputed issues of fact, the district court concluded that the evidence was not material for purposes of *Brady*. Carter and the State do not argue in their briefs that the district court's findings with respect to favorability and suppression were in error. Instead, Carter's and the State's briefs focus on the question of whether the evidence was prejudicial—*i.e.* material—for purposes of *Brady*.

¶55 We conclude that a genuine dispute of material fact exists as to whether the evidence was prejudicial under *Brady*. And because the materiality standard under *Brady* is the same materiality standard contained in the PCRA, we conclude that a genuine dispute of material fact exists as to whether Carter has demonstrated prejudice remediable by the PCRA by way of a *Brady* violation.

### A. Financial Benefits

¶56 Carter's first piece of evidence is that the Provo Police Department provided the Tovars with various financial benefits. As noted above, *see supra* ¶¶ 31–32, the Tovars now declare that police moved the family to different apartments and paid the family's rent while the Tovars waited to testify at trial. The Tovars also declare that police provided other, smaller financial benefits such as paying utility bills and buying groceries.

¶57 Carter argues that the financial benefits provided to the Tovars demonstrate that the Tovars' testimony was "bought and paid for by police." He claims that this evidence undermines the Tovars' testimony as a whole and that, because of the importance of the Tovars' testimony to the State's case, the evidence undermines the confidence in Carter's verdict and sentence.

¶58 The district court rejected the argument that the receipt of financial benefits undermines the confidence in the verdict and sentence. While it acknowledged that this is "certainly impeachment evidence," it concluded that the materiality of the evidence was "minimal." To support its conclusion, the district court noted that it believed the Tovars' testimony at trial was consistent with statements they made prior to the time that the alleged financial assistance was provided. Additionally, the district court held that any inference that the Tovars gave altered or untruthful testimony as a result of the benefits they received was speculative. Furthermore, the district court said that the prosecution could have rebutted any claims of financial benefits in exchange for changed testimony by presenting evidence that the payments were made for the Tovars' protection because they feared Carter. In the district court's estimation then, "this evidence had as great of a capacity to prejudice [Carter] as it did to impeach the Tovars' credibility, if not greater."

¶59 Carter rejects the district court's characterization of the Tovars' testimony as consistent. In support, Carter points to a number of inconsistencies in the Tovars' testimony over time.

¶60 First, Carter points to Mr. Tovar's inconsistent versions of what Carter told Mr. Tovar he was going to do when he left the Tovars' home on the night of the murder. While Mr. Tovar initially told police that Carter had said that he was going to "try to steal some money," when it came time to testify at trial Mr. Tovar told the jury that Carter said he was "going to rape, break, and drive." Carter notes that this inconsistency was especially harmful to Carter at resentencing because the prosecution emphasized this testimony to demonstrate aggravating circumstances under which the murder took place.

¶61 Second, Carter points to Mr. Tovar's contradictory statements regarding the gun used in the murder. Although Mr. Tovar initially denied any knowledge of the gun's whereabouts, he eventually testified at trial that he had disposed of the gun at Carter's request. In Carter's estimation, this altered story resolved an important unanswered question in the State's case at the last minute.

¶62 And third, Carter points to Ms. Tovar's inconsistent versions of what Carter did when he returned to the Tovars' home and told them what had happened. When Ms. Tovar was interviewed by police, she told police that Carter was talking and laughing to Mr. Tovar about something that she could not understand. And at the preliminary hearing, Ms. Tovar made no mention of Carter laughing. But at trial Ms. Tovar told the jury that

Carter "laughed and laughed" about something he had done and that he was "laughing and giggling" while demonstrating the murder for Mr. Tovar. Additionally, Ms. Tovar's testimony with respect to any demonstration by Carter also changed over time. While Ms. Tovar told police in her initial interview that Carter "put his hands behind his back with the back of his wrists touching together," she testified at the preliminary hearing that Carter signaled that he was shooting someone and later testified at trial that Carter demonstrated how he had forced someone to lay on the ground and how he subsequently stabbed that person.

¶63   In essence, Carter argues that the inconsistencies in the Tovars' testimony create a reasonable inference that the Tovars changed their testimony in response to the financial benefits provided by police and this undermines confidence in the verdict and sentence.[10]

¶64   The State responds that Carter raises no material inconsistency with respect to the Tovars' testimony.[11]

---

[10] Carter also challenges the district court's finding that the State could have rebutted claims of materiality by demonstrating that the financial benefits were provided for the Tovars' protection. Specifically, Carter asserts that the district court could not rely on evidence outside of the record in determining materiality and that, even if the district court could consider extra-record evidence, the evidence the district court considered would be nonetheless inadmissible under the Utah Rules of Evidence. Because we conclude that a genuine issue of material fact exists with respect to materiality even in light of the extra-record evidence that the district court considered, we need not and do not reach these arguments.

[11] The State also responds that Carter did not preserve the inconsistency argument below. We disagree. Carter raised the issue of inconsistent testimony in his briefing in the district court when he explained that Mr. Tovar's testimony regarding Carter's intent and state of mind "varie[d] considerably" between the preliminary hearing and trial and that this "demonstrates one significant way in which [Mr. Tovar's] testimony appears to have been coached." To the extent that Carter points out inconsistencies he did not raise in his motion opposing summary judgment, these arguments are a direct reaction to the district court's heavy reliance on its perceived consistency of the Tovars' various statements over time to hold that no prejudice ensued in this case.

¶65    First, the State argues that any inconsistencies in Mr. Tovar's testimony were a result of his fear of retaliation by Carter. In the State's view, Mr. Tovar's inconsistent statements were simply a manifestation of his reluctance to divulge information because he feared retaliation by Carter or Carter's family. In this sense, the State's argument is not that Mr. Tovar's statements were inconsistent, but rather that any inconsistency was not a result of any financial benefits that the Tovars received.

¶66    Second, the State argues that Ms. Tovar's statements were not inconsistent. The State frames any inconsistencies in Ms. Tovar's statements as "minor discrepancies" and "simply additional color that witnesses usually add at trial." The State also asserts that any inconsistencies between the initial police report and Ms. Tovar's testimony at the preliminary hearing and trial can be attributed to the fact that police reports are not word-for-word transcriptions.

¶67    We disagree with the State and the district court that the Tovars' testimony was fundamentally consistent, especially in the context of summary judgment where all inferences must be made in favor of the non-moving party, Carter. Not only can it be easily inferred from the face of the record that their testimony evolved over time, but their testimony evolved in ways that were damaging to Carter's case, especially with respect to his sentencing. Mr. Tovar's testimony regarding the murder weapon, which was never recovered, helped the prosecution close the loop with respect to one of the most important unanswered factual questions in the case. And the Tovars' testimony regarding Carter's state of mind gave the State the evidence it needed to argue aggravating circumstances to the jury and push for the death penalty.

¶68    We also disagree with the State's assertion that any change in Mr. Tovar's testimony was driven solely by a fear of Carter.[12] On summary judgment we are to "draw[] all reasonable inferences from

---

[12] The State also argues, rather curiously, that it could have presented prior inconsistent statements Mr. Tovar made to Ms. Bermudez to demonstrate that the Tovars were in fact fearful of Carter. While this may be true, the ultimate effect of such a strategy seems to cut against the State. By providing prior inconsistent statements, the State would be impeaching its own key witnesses. And we are skeptical that impeaching the Tovars with prior inconsistent statements would be more harmful than helpful to Carter.

the facts in the light most favorable to the nonmoving party." *Truck Ins. Exch. v. Rutherford*, 2017 UT 25, ¶ 5, 395 P.3d 143. Given all of the allegations—financial benefits, testimony coaching, and police threats—in the Tovars' declarations, we believe it is reasonable to draw the inference that the Tovars' inconsistent statements were driven at least in part by the financial benefits they allege to have received.

¶69    We leave for later analysis whether, when considered in tandem with the other *Brady* material presented by Carter, this evidence undermines confidence in the verdict and sentence.

### B. Improper Testimony Coaching

¶70    Carter's second piece of evidence is that the prosecution coached the Tovars' testimony. The Tovars declare that the prosecutor met with them before trial and told them what he wanted them to say when they testified.

¶71    The district court concluded that Carter did not provide any specific evidence of what the prosecutor told the Tovars to say and therefore any inference that the Tovars' testimony would have been more favorable to Carter without the alleged coaching is speculative. The district court also found that the Tovars' testimony was consistent and reliable, and that "[b]ecause of the consistency of the Tovars' testimonies, the fact that the Tovars met with the prosecutor before trial is unlikely to have changed the jury's view of the evidence." For these reasons, the district court held that Carter had not alleged facts sufficient to show that any prejudice ensued.

¶72    Carter again argues that the Tovars' testimony was inconsistent. For this reason, Carter claims that the district court's materiality analysis was flawed.

¶73    The State again responds that Carter fails to show any material inconsistency in the Tovars' testimony.

¶74    We agree with the district court that the Tovars' declarations do not allege the prosecutor asked them to alter their testimony in any substantive way. Standing alone, this claim is likely insufficient to create a material dispute of fact regarding materiality. But we do not view this claim in isolation, we view it along with Carter's other claims of misconduct and evidence suppression. *See Kyles*, 514 U.S. at 436 ("The . . . final aspect of . . . materiality to be stressed here is its definition in terms of suppressed evidence considered collectively . . . ."). Furthermore, for the reasons outlined in section II.A, we agree with Carter that, when drawing the inferences in Carter's favor, the Tovars' testimony is inconsistent in

meaningful ways. In the same way that it is reasonable to infer that the Tovars' testimony changed over time in response to financial benefits received, it is likewise reasonable to infer that the Tovars' testimony changed over time, at least in part, in response to testimony coaching by the prosecutor. When considered alongside the financial benefits and the threats of deportation and separation, the inferences drawn in favor of Carter from the accusations of testimony coaching become more than mere speculation.

¶75    The line between a reasonable inference and speculation can be difficult to draw, "[b]ut a reasonable inference exists when 'there is at least a foundation in the evidence upon which the ultimate conclusion is based,' while 'in the case of speculation, there is no underlying evidence to support the conclusion.'" *Heslop v. Bear River Mut. Ins. Co.*, 2017 UT 5, ¶ 22, 390 P.3d 314 (citations omitted). In this case, Carter has laid a foundation upon which the ultimate conclusion of changed testimony in response to prosecutor and police coaching could be based. The fact that the Tovars' testimony is inconsistent over time, coupled with the allegations of financial benefits and police threats, provides us with enough foundation to infer that the Tovars' testimony changed in response to testimony coaching. Although it would undoubtedly be helpful to his case for Carter to identify specific instances of testimony coaching, we are able to draw these inferences in Carter's favor for purposes of summary judgment.

¶76    We again leave for later analysis whether, when considered in tandem with the other *Brady* material presented by Carter, this evidence undermines confidence in the verdict and sentence.

### C. Police Threats and Orders to Lie

¶77    Carter's third piece of evidence is that police threatened the Tovars and ordered the Tovars to lie about the receipt of financial benefits if asked about them at trial. Mr. Tovar declares that police instructed the Tovars not to say anything about the receipt of financial benefits because "it was such a minimal amount." Ms. Tovar echoes this sentiment, declaring that officials told them not to say anything at trial if asked about the police paying for their rent, utilities, and groceries. The Tovars declare that police threatened Mr. Tovar with deportation, removal of the Tovars' infant son from the family, and potential prison time if they did not cooperate.

¶78    The district court held that this evidence would not have made a material difference with respect to impeaching either the

Tovars or the police who allegedly threatened the Tovars. The district court held it was not material with respect to the Tovars because the Tovars' testimony was consistent throughout and the Tovars did not allege specific ways in which their testimony changed as a result of these threats.[13] The district court also concluded that this evidence would not cast the trial in a different light because defense counsel already had access to Lieutenant Pierpont's interrogation of Mr. Tovar in which he told Mr. Tovar, "Don't get yourself buried, my friend" and "If you start lying to me, I can't do anything but come down on you." Additionally, trial counsel was aware that Mr. Tovar had originally been charged with obstruction of justice and was therefore facing incarceration and possibly removal of his infant son. Furthermore, Carter's trial counsel presented evidence to the jury that the Tovars were in the country illegally and may have been afraid of deportation. The district court reasoned that the threats described in the Tovars' declarations are similar enough to other threats known to trial counsel.[14]

¶79    With respect to impeaching police testimony, the district court held that the Tovars had not identified which police officers threatened them and therefore the district court was unable to determine the value of the impeachment evidence, if any. The district court also found that there was not a sufficient factual basis to support a reasonable inference that Mr. Tovar was threatened before his interrogation. The district court acknowledged that Lieutenant Pierpont made a reference to speaking with Mr. Tovar prior to his interrogation but ultimately concluded that it could not

---

[13] The district court held that this evidence would not be material with respect to impeaching the Tovars "[f]or the same reasons articulated above." It is not entirely clear what this ambiguous reference to "the same reasons articulated above" means, but the most natural import seems to be that the district court was referring to the Tovars' supposedly consistent testimony and the lack of specific allegations of how the Tovars' testimony would have been different but for the threats and orders to lie.

[14] Without explicitly saying so, it seems that the district court found this evidence to be merely cumulative of other evidence presented at trial. In other words, the district court found that this evidence provided no impeachment or exculpatory information beyond what Carter's counsel already knew at trial. This court has held that cumulative evidence is "not material for purposes of *Brady*." *Tillman*, 2005 UT 56, ¶¶ 37–38, 41.

"reasonably infer that [Lieutenant Pierpont] threatened Mr. Tovar on this occasion."

¶80    Carter argues that any threats known to trial counsel pale in comparison to the Tovars' declaration that they were instructed to lie on the stand and that this alone is valuable impeachment evidence. Additionally, Carter asserts that he is not required to identify specific officers, but that the clear implication is that the officers involved were Lieutenant Pierpont and Officer Mack.

¶81    Carter also argues that he has provided a sufficient factual basis to support a reasonable inference that Mr. Tovar felt threatened before his interrogation. Specifically, Carter asserts that Lieutenant Pierpont's statement that he spoke with Mr. Tovar prior to the investigation combined with Mr. Tovar's declaration that he felt threatened by police before his interrogation meets Carter's burden to show that there is a genuine dispute of material fact as to whether Mr. Tovar was threatened before his interrogation.

¶82    The State responds that Carter has proffered no evidence of a nexus between the alleged threats and the Tovars' testimony. The State argues that Mr. Tovar's "vague assertion" that he felt pressured before his interrogation is insufficient to show that this feeling came from any police threats. In the State's view, Carter has not provided specific facts that could lead to the inference that threats by police led the Tovars to falsely incriminate Carter.

¶83    We find that a reasonable inference can be drawn that Mr. Tovar was threatened by police before his interview and that the Tovars were instructed to lie on the stand, at least with respect to the receipt of benefits. We agree with Carter that Mr. Tovar's declaration that he felt pressured before his interrogation coupled with the fact that Mr. Tovar had an undisclosed conversation with Lieutenant Pierpont before his interrogation is sufficient to draw a reasonable inference that Mr. Tovar was threated before his interrogation. While it is unknown what was said or what happened during that first conversation, the fact that the conversation took place creates "a foundation in the evidence upon which the ultimate conclusion is based." *Heslop*, 2017 UT 5, ¶ 22 (citation omitted) (internal quotation marks omitted).

¶84    We also find that the threats alleged in Mr. Tovar's declaration are different enough from the threats known to trial counsel as to render the new threats non-cumulative. While trial counsel was assuredly aware of the threats contained in the transcript of Mr. Tovar's interrogation, and potentially aware of any

threats of prison time or deportation related to Mr. Tovar's obstruction of justice charge, trial counsel was not on notice of any threats linked to false testimony. That is, the threats Mr. Tovar now alleges were threats levied to induce false testimony on behalf of the Tovars. According to Mr. Tovar, he felt that "if [he] had testified that [the police] had paid for the rent and phone, etc., that [the police] would have carried out their threats and would have arrested us, deported us and taken our infant son away from us." Because the threats described in the Tovars' declarations are inextricably linked to police orders to lie about the receipt of financial benefits, this evidence is non-cumulative of evidence presented at trial.

¶85 We now turn to our analysis of whether all the evidence and the reasonable inferences therefrom could have the cumulative effect of undermining confidence in the verdict.

### D. Cumulative Effect of the Evidence

¶86 As noted above, the State has not challenged the district court's finding that there is a genuine issue of material fact as to whether the first two prongs—suppression and favorability—of Carter's *Brady* claim have been satisfied. We therefore must only determine whether summary judgment was appropriate for the State on the issue of materiality. We conclude that a genuine issue of material fact exists as to whether Carter was prejudiced by the suppression of the evidence with respect to both the guilt and sentencing phases. We therefore reverse the district court and remand for an evidentiary hearing on this issue.

¶87 In order to determine whether suppression of the evidence could have prejudiced Carter, we must decide whether the evidence was material. *Tillman*, 2005 UT 56, ¶ 29. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. Instead, to determine whether a "reasonable probability" of a different result exists, the relevant inquiry is whether the accused "received a fair trial, understood as a trial resulting in a verdict worthy of confidence" in the absence of the undisclosed evidence. *Id.* In other words, "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678). When making this determination, "the reviewing court may consider directly any

adverse effect that the prosecutor's failure to [disclose *Brady* material] might have had on the preparation or presentation of the defendant's case." *Bagley*, 473 U.S. at 683.

¶88 Therefore, we must determine if there is a genuine dispute of material fact as to whether the absence of the following evidence, when considered collectively, undermines confidence in Carter's verdict and sentence: (1) the financial benefits received by the Tovars; (2) the testimony coaching received by the Tovars; and (3) police threats and orders directed at the Tovars.

¶89 The district court held that no such dispute of material fact existed. It held that "even assuming the allegations in the [Tovars'] declarations are true and credible, the evidence does not cast the case in such a different light 'as to undermine confidence in the verdict or sentence.'" This conclusion was based on a number of findings. It found that the combined effect of the content in the Tovars' declarations did not undermine the Tovars' credibility as witnesses because the Tovars had already been impeached at trial in a variety of ways. It also found that Carter's confession was "extremely incriminating" and therefore trial counsel would have had every motivation to challenge the confession, regardless of the evidence in the Tovars' declarations. Additionally, the district court reiterated its finding that Carter did not produce sufficient evidence to show that he could have challenged the veracity of law enforcement officer testimony because the Tovars' declarations do not identify specific officers. Finally, the district court dismissed Carter's argument that the Tovars' declarations could have been used to exclude their testimony during resentencing and noted that, even if the testimony was allowed during resentencing, the State could have presented evidence of prior inconsistent statements from Mr. Tovar to demonstrate that all payments were made for purposes of witness protection.

¶90 On appeal, Carter argues that the district court erred in determining that the evidence, as a matter of fact and law, does not undermine confidence in the verdict and sentence. We agree.

¶91 As this court recognized when Carter appealed the result of his resentencing hearing, the Tovars were "the State's key witnesses." *State v. Carter*, 888 P.2d 629, 645 (Utah 1995). Their testimony was important in a number of ways. "For example, the Tovars' testimony corroborated Carter's confession by placing him in the Olesens' home on the night of the murder and provided persuasive evidence that he committed the homicide." *Id.* The importance of the Tovars' testimony was only magnified by the

complete lack of physical evidence linking Carter to the scene of the crime and the circumstances under which Carter's confession was obtained.

¶92 The prosecution also heavily relied upon the Tovars' testimony at resentencing to demonstrate aggravating circumstances. The prosecution made a number of references to the Tovars' testimony in explaining to the resentencing jury why the State was pushing for the death penalty. When asking the jury to "[c]onsider the intent of [Carter]," the prosecutor told them "he wanted to 'rape, break and drive.' He wanted to hurt someone. He wanted to get something for himself. He went in there intending to do violence. And then he exposed and brutalized the woman." The prosecutor also asked the jury to consider how Carter felt while he committed the murder, noting that, "Perhaps the best evidence of that is . . . at the Tovars' home as he over and over again demonstrated to them what he had done. [Carter was] excited, was laughing, was giggling . . . ." Then adding, "He wasn't sickened, he wasn't saddened, he wasn't even frightened. He was thrilled. He was, he tortured that woman, and that was a heinous killing." The prosecutor opined that Carter's attitude "before, after and during the crime . . . exhibit[ed] a callous disregard for human life, an excitement and a blood lust." And in closing, the prosecutor asked the jury, "Is the death penalty right, is it appropriate? [To answer] that you have to consider this defendant. A man who delighted in killing. A man who was thrilled about the gore."

¶93 It is clear then that the Tovars' testimony was crucial at both the guilt and sentencing phases of Carter's trial. At the guilt phase, the Tovars' testimony provided corroboration for Carter's otherwise largely uncorroborated confession. Mr. Tovar's last-minute testimony about the disposal of the murder weapon also helped the State close the loop on one of the case's biggest unanswered questions. And at the sentencing phase, the Tovars provided the jury with damning insight into Carter's mind both before and after the murder took place. The importance of the Tovars' testimony is critical to our materiality analysis under *Brady*. Any evidence challenging the Tovars' testimony carries special weight given the importance of their testimony to Carter's conviction and death sentence.

1. Guilt Phase

¶94 The evidence contained in the Tovars' declarations creates a genuine dispute of material fact as to whether confidence in the verdict is undermined. If just one juror had concluded that Carter

was not guilty, then he would have been acquitted. The verdict in any criminal case "shall be unanimous." UTAH CODE § 77-35-21(b) (1985).

¶95 While Carter's confession is itself very incriminating, this court has acknowledged that the Tovars were "the State's key witnesses" that "corroborated Carter's confession" and "provided persuasive evidence that he committed the homicide." *Carter*, 888 P.2d at 645. Implicit in that acknowledgment is the notion that Carter's confession may not have been able to stand completely on its own.[15] This notion is no doubt a byproduct—or at least a partial byproduct—of the lack of physical evidence linking Carter to the murder. The State needed something more to corroborate Carter's testimony, and it found that corroboration in the Tovars. And while the Tovars were impeached at trial, we cannot say as a matter of law and fact that the evidence contained in their declarations does not undermine confidence in the verdict.

¶96 The district court acknowledged that "a witness's credibility may reach a 'tipping point' due to sheer volume of impeachment evidence." But the district court ultimately discarded such a concern noting that, "in the court's view, because of the consistency of the Tovars' statements incriminating [Carter], the additional impeachment evidence proffered in this case does not push the [Tovars'] credibility beyond that point." On summary judgment, our view diverges from that of the district court. Although the Tovars' testimony remains relatively consistent with respect to whether Carter admitted to committing the murder, the corroborative value of the Tovars' testimony is nonetheless called into question by the evidence in their declarations.

¶97 First, Mr. Tovar declares that he felt threatened before his interrogation. This statement lessens the ability of the court to rely on any consistency in the Tovars' testimony. Even if the Tovars' testimony was entirely consistent, the value of that testimony becomes diminished once tainted by accusations of police threats before any testimony is given. The jury was never able to evaluate how strongly the Tovars' testimony corroborated Carter's confession

_____

[15] It is worth noting again that the validity of Carter's confession itself is not at issue in this case. What is at issue, however, is the veracity of certain evidence that corroborated and supported Carter's confession.

when viewed against the backdrop of police threats and accusations of testimony coaching.

¶98    Second, as has been discussed at length above, the Tovars' testimony is not consistent—even with respect to facts primarily relevant to guilt. For example, Mr. Tovar changed his testimony with respect to the whereabouts of the murder weapon. While Mr. Tovar was cross-examined and admitted on the stand to previously lying regarding the whereabouts of the gun, the jury was not presented with financial benefits, police threats, and testimony coaching as possible motives for the change of heart. That is, the jury was left to evaluate Mr. Tovar's credibility in that moment in a vacuum. With the evidence in the declarations, a jury would be able to judge Mr. Tovar's credibility in light of the benefits, threats, and coaching.

¶99    Accordingly, we disagree with the district court's assessment that the consistency in the Tovars' statements prevents the Tovars' credibility from reaching a tipping point as a matter of law. Instead, we view the Tovars' testimony, as we must under the summary judgment standard, as inconsistent at times and tainted as a whole by the evidence contained in the Tovars' declarations. For these reasons, we hold that there exists a genuine dispute of material fact as to whether the outcome of the trial would have been different but for the absence of the evidence.[16]

2. Sentencing Phase

¶100    The evidence contained in the Tovars' declarations also creates a genuine dispute of material fact whether confidence in the sentence is undermined. In fact, we find this conclusion much easier to reach in the context of sentencing. The reason for this is simple: to whatever extent the State can point to consistency in the Tovars' testimony to rebut materiality with respect to guilt, that ability to rebut materiality with consistency is significantly weaker with respect to sentencing.

¶101    While the Tovars' testimony may have been relatively consistent with respect to facts that corroborate Carter's confession, the Tovars' testimony is not consistent with respect to facts relevant

_____

[16] We also acknowledge the district court's concerns about the specificity of some of the allegations in the Tovars' declarations. Because the lack of specificity of certain claims does not affect our determination that a genuine dispute of material fact exists, we simply submit that these concerns should be allayed through an evidentiary hearing.

to sentencing. As discussed above, the Tovars provided damning testimony regarding Carter's state of mind both before and after the murder. *See supra* ¶¶ 26–27. At resentencing, the State repeatedly drew from this testimony to paint Carter as someone who entered the Olesens' home with a premeditated intent to rape and left without the slightest feeling of guilt or remorse. Crucially, these facts were not presented until trial, which, according to the Tovars' declarations, did not take place until months of financial benefits, testimony coaching, police threats and orders to lie on the stand had passed.

¶102 With respect to sentencing, this case is perhaps most similar to *Tillman*, a case in which we overturned a death sentence when defense counsel uncovered interview transcripts that significantly undermined the testimony of the State's key witness. In *Tillman*, a lack of forensic evidence linking Mr. Tillman to the crime left the State in a situation in which the testimony of Mr. Tillman's girlfriend, Carla Sagers, became "unquestionably the most critical evidence . . . presented at trial." 2005 UT 56, ¶ 4. Ms. Sagers initially confirmed the alibi that Mr. Tillman gave to police. *Id.* However, she later recanted her testimony in exchange for full immunity. *Id.* According to Ms. Sagers, she witnessed Mr. Tillman bludgeon the sleeping victim in the head with an axe twice and then set the victim's bed on fire while the victim was still alive. *Id.* At trial and sentencing, the State used Ms. Sagers's testimony to paint Mr. Tillman as "a man who repeatedly manipulated and took advantage of innocent women, with Sagers merely serving as his latest victim." *Id.* ¶ 85. This was a "critical component" of the State's argument for imposition of the death penalty, an argument that "depended heavily on the prosecution's ability to diminish . . . any moral culpability on the part of Sagers." *Id.* ¶ 84.

¶103 The interview transcripts in *Tillman* contained a number of revelations for defense counsel. First, the transcripts revealed that Ms. Sagers "experienced a marked improvement in her ability to confidently recall the sequence of events surrounding [the] murder." *Id.* ¶ 87. Second, the transcripts contained passages that suggested that the detective investigating the case was "coaching Sagers to enable her to supply a more believable narrative." *Id.* Third, the transcripts contained notations of laughter at various points in the interview. *Id.* ¶ 69. The district court in *Tillman* found that some notations referred simply to "nervous laughter" while others appeared to demonstrate inappropriate levity, such as when discussing "the violent death of a human being and [Sagers's] involvement in that death." *Id.* (alteration in original) (internal

quotation marks omitted). And finally, the transcripts contained express statements that Tillman was depressed and suicidal prior to the commission of the murder. *Id.* ¶ 90.

¶104   This court held that the suppressed transcripts constituted a *Brady* violation and reversed Mr. Tillman's death sentence, sending the case back down for a new sentencing proceeding. *Id.* ¶ 94. We noted that Mr. Tillman could have utilized the transcripts to portray Ms. Sagers's testimony as "a work in progress, carefully honed by the prosecution over the course of many months, and which only took its final shape mere days before trial." *Id.* ¶ 87. Mr. Tillman also could have advanced the argument that Ms. Sagers's testimony "was motivated by a desire to please the people who had granted her complete immunity." *Id.* The transcripts also would have been useful to directly confront the State's portrayal of Ms. Sagers as just another one of Mr. Tillman's victims. *Id.* ¶ 88. We noted that an "increased moral culpability on the part of Sagers would throw into even harsher relief the disproportionate treatment of Tillman when compared with the treatment of Sagers." *Id.* Finally, we found that information about Tillman's depression and suicidal thoughts may have affected sentencing deliberations. *Id.* ¶ 90.

¶105   Many of the concerns that motivated our decision in *Tillman* are present in this case. As in *Tillman*, no physical evidence links Carter to the crime scene. As such, the Tovars' testimony was a critical component of the State's case—especially with respect to sentencing.[17] Like in *Tillman*, the Tovars' declarations contain allegations of testimony coaching in the face of police threats and financial assistance. Accordingly, Carter has a colorable claim that the Tovars' testimony evolved over time to become more damaging to Carter in an attempt to please the people who had provided them with rent money and threatened them with deportation and separation if they did not cooperate.

---

[17] One obvious difference between this case and *Tillman* is that Carter proffered a confession in which he admits to committing the crime. However, nothing in the signed confession mentions a premeditated intent to rape or suggests any lack of remorse after committing the murder. In this sense, then, the Tovars' testimony was the only direct evidence of Carter's intent and state of mind—two issues that were crucial to the State's argument for imposition of the death penalty at resentencing.

¶106   As we noted in *Tillman*, "all that [i]s necessary . . . to avoid the death penalty [i]s a single doubting juror." *Id.* ¶ 92. If Carter had been able to impeach the Tovars with the information contained in their declarations the outcome may well have been very different. Instead of having to rely only on impeachment information such as Mr. Tovar's criminal record, the jury would have heard that the Tovars were threatened by police, had received significant financial benefits from the police, had been told by the police to lie about these benefits if asked at trial, and had received testimony coaching from the prosecution. This would have assigned a strong motive to the Tovars to change their testimony in a way that would make it more likely that Carter received the death penalty. Not only that, but the strong motive would have been directly linked to the very parties prosecuting Carter. We may not be certain that disclosure of the evidence contained in the Tovars' declarations would have resulted in a different sentence, but giving every inference to Carter in the context of summary judgment, we are compelled to conclude that a significant possibility exists that the outcome would have been different. That possibility may undermine confidence in the sentence and therefore may constitute prejudice under *Brady* and the PCRA after an evidentiary hearing is held in this case.

## III. CARTER'S *NAPUE* CLAIM

¶107   It has long been established that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). In *Napue v. Illinois*, the United States Supreme Court announced that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. 264, 269 (1959). Accordingly, "[a] new trial is required if 'the [uncorrected] false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271).

¶108   Carter asserts one *Napue* violation: the prosecutor at trial, Mr. Watson, failed to correct the testimony of Mr. Tovar regarding the financial benefits that the Tovars received from police prior to trial. When asked if he had received any benefits in connection with his testimony, Mr. Tovar responded that he had only received his fourteen-dollar witness fee. The Tovars now declare that police provided them with numerous financial benefits including paying for rent, groceries, and utilities. This declaration is at least partially

corroborated by the deposition of Mr. Watson and the declarations of Officer Mack and Officer Eggen. *See supra* ¶¶ 33–34.

¶109 The district court held that there was a genuine dispute of material fact regarding whether Mr. Watson knowingly failed to correct Mr. Tovar's testimony. The district court also acknowledged that the standard for relief in the *Napue* context—that the uncorrected testimony *could* have affected the judgment of the jury—is lower than the standard for relief in the *Brady* context—that the suppressed evidence *would* have affected the judgment of the jury. However, without ruling on whether Carter had presented a viable *Napue* claim, the district court concluded that the failure to correct false testimony in this case did not satisfy the PCRA's materiality standard because Carter did not establish that "there would be a reasonable likelihood of a more favorable outcome in light of the facts proved in the post-conviction proceeding." UTAH CODE § 78B-9-104(2).

¶110 The district court based this conclusion on its finding that "evidence of financial assistance had as great of a potential to prejudice [Carter] as it did to help him" because "the reasons why the financial assistance was provided would have suggested to the jury that [Carter] is a dangerous person." Additionally, the district court found that evidence of financial benefits would be unlikely to cause the jury to disregard the Tovars' testimony or lessen their credibility. This was because the district court believed that Mr. Tovar was thoroughly impeached by other evidence and that the substance of his testimony remained consistent from before financial benefits were paid up until trial.

¶111 On appeal, Carter argues that the district court erred in assessing Carter's claim under the more stringent PCRA materiality standard. In the alternative, Carter argues that his *Napue* claim demonstrates prejudice even under the PCRA's standard. Specifically, Carter asserts that the district court's conclusion that Mr. Tovar's testimony was consistent is factually inaccurate and that any attempt by the State to impeach the Tovars with prior inconsistent statements alleging that they feared Carter would have benefited Carter by way of discrediting the Tovars' testimony.

¶112 We agree with Carter that his *Napue* claim creates a genuine dispute of material fact as to whether there would be a reasonable likelihood of a different outcome with respect to guilt and sentencing had Mr. Watson corrected Mr. Tovar's false testimony. Therefore, Carter has demonstrated a genuine dispute of material fact as to whether he was prejudiced under the PCRA's materiality

standard. Accordingly, the district court's grant of summary judgment on this issue was erroneous.[18] We reach this conclusion on many of the same grounds discussed with respect to Carter's *Brady* claims.

¶113   For reasons detailed above, *see supra* ¶¶ 59–67, we disagree with the district court's conclusion that Mr. Tovar's testimony was consistent over time. Mr. Tovar changed his story to both provide the missing link with respect to the murder weapon and to provide the State with testimony about Carter's premeditated intent to rape. In other words, Mr. Tovar's testimony changed over time in a way that was damaging to Carter at both the guilt and sentencing phases.[19]

¶114   We further disagree with the district court's conclusion that the evidence of financial benefits had as great a potential to prejudice Carter as it did to help him. As noted above, *see supra* ¶ 68 n.12, we remain skeptical—at best—that impeaching the Tovars with prior inconsistent statements would be more harmful than helpful to Carter. In doing so, the State would be impeaching *its own key witnesses*. Given the lack of physical evidence linking Carter to the crime and given the lack of intent discernible from Carter's confession, we simply cannot conclude that impeaching the Tovars with prior inconsistent statements would prejudice Carter more than it would help him. Most importantly, when drawing all reasonable inferences in Carter's favor—as we must do on summary judgment—we find that there is a reasonable inference that impeaching the Tovars would help Carter more than it would prejudice him. The district court's disposal of Carter's *Napue* claim was therefore erroneous.

¶115   Carter has demonstrated a genuine dispute of material fact as to whether there is a reasonable probability that the outcome of

---

[18] Because we hold that a genuine dispute of material fact exists under the more stringent PCRA standard, we need not address Carter's argument that the district court erred in applying the PCRA materiality standard. We note that implicit in our holding is the fact that Carter's *Napue* claim also satisfies the less stringent *Napue* materiality standard.

[19] We again note that the inconsistency in Mr. Tovar's testimony is more damaging with respect to sentencing, given the lack of any evidence of premeditated intent contained in Carter's signed confession.

the proceedings would have been different but for Mr. Watson knowingly failing to correct Mr. Tovar's false testimony. If testimony about the financial benefits the Tovars received had been revealed, Carter would have been able to more effectively impeach the Tovars. Carter would have been able to question the Tovars' motives for testifying against him and would have been able to identify the State as a powerful catalyst for the inconsistencies in the Tovars' testimony. Furthermore, this revelation may have opened the door for Carter to elicit testimony regarding the Tovars' claims that police instructed them to lie at trial about any benefits received. Taken together, this evidence would have had the effect of tainting the Tovars' testimony by assigning an ulterior motive to their statements made at trial: the Tovars were testifying on behalf of the State in exchange for financial benefits received. We cannot conclude—as the district court did—that this evidence, as a matter of law, does not demonstrate a reasonable probability of a different outcome. Accordingly, we reverse and remand for an evidentiary hearing on Carter's *Napue* claim.

## IV. CARTER'S IMPROPER VOUCHING CLAIMS

¶116  In addition to his *Brady* and *Napue* claims, Carter also claims that the prosecution improperly vouched for the Tovars at trial and that this vouching presents constitutional error correctable under the PCRA.

¶117  While prosecutors are permitted to invite the jury to credit the testimony of a state's witness, it is impermissible for the prosecution to "place[] the prestige of the government behind the witness by making explicit personal assurances of the witness' credibility" or "implicitly . . . indicat[e] that information not presented to the jury supports the testimony." *State v. Ashcraft*, 2015 UT 5, ¶ 35, 349 P.3d 664 (citation omitted) (internal quotations marks omitted).

¶118  Carter argues that the prosecution improperly vouched for the Tovars' testimony at trial. Carter cites to Mr. Watson's closing statement, in which he said, "You know, [Ms. Tovar] to me was one of the most impressive witnesses in this particular case. She told you in all honesty everything that she saw." Carter also cites to the trial testimony of Lieutenant Pierpont, who testified on cross-examination that he "ha[d] a great deal of belief in [Mr. Tovar's] credibility." The State moved for summary judgment on the ground that this claim was procedurally barred.

¶119  The district court agreed with the State and held that Carter's claim was barred under PCRA section 78B-9-107(2)(e),

which provides a one year statute of limitations from "the date on which petitioner knew or should have known, in the exercise of reasonable diligence, of evidentiary facts on which the petition is based." The district court held that Carter knew of the factual basis for asserting his claim when Mr. Watson and Lieutenant Pierpont made their statements during the guilt phase of the criminal trial in 1985 and his claim was therefore procedurally barred.

¶120   On appeal, Carter argues that no such time bar exists because the claim of improper vouching is "inextricably bound with the newly discovered evidence." Accordingly, Carter argues that because his claim of improper vouching is raised in the context of the newly discovered evidence, this contextual wrinkle reset the statute of limitations clock when Carter discovered the evidence in 2011. We disagree.

¶121   As the district court correctly pointed out, the basis for an improper vouching claim is generated by the prosecutor's statements to the jury, not by the prosecutor's knowledge of the veracity of a witness's testimony. In other words, the veracity of the underlying testimony being bolstered is irrelevant to the question of "whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility." *State v. Carter*, 776 P.2d 886, 892 (Utah 1989) (citation omitted) (internal quotation marks omitted). What is relevant is that the bolstering occurred. Because Carter knew of the prosecutor's "indicati[on] [of] a personal belief in the witness' credibility" when the prosecutor and Lieutenant Pierpont indicated those beliefs at trial, the one year statute of limitations began to run in 1985. Accordingly, Carter is procedurally barred from bringing his claim for improper vouching.

## V. CARTER'S EVIDENTIARY CLAIMS

¶122   In addition to its motion for summary judgment, the State also filed a number of evidentiary objections to exhibits attached to Carter's petition for post-conviction relief. The district court granted a number of these objections and Carter appeals therefrom. We now address Carter's response to each of these rulings in turn.

### *Declaration of Steven Killpack*

¶123   Carter proffered a declaration from Steven Killpack, who was the Utah County Attorney during portions of Carter's resentencing proceedings in 1992. In his declaration, Mr. Killpack states that the information in the Tovars' declarations constitutes *Brady* material and that he would have turned this information over to defense counsel if he had known about it at resentencing. In

Mr. Killpack's estimation, this information is "significant impeachment information" and is "material to the outcome of guilt and of sentencing." He also states that he is unsurprised that the Tovars would have received benefits and that the Provo Police Department would be "highly motivated to do everything possible to ensure a conviction and a death sentence" given Ms. Olesen's relation to the Provo Police Chief.

¶124 The State argued below that the bulk of Mr. Killpack's declaration comprises opinion testimony and was inadmissible under Utah Rule of Evidence 602 because Mr. Killpack does not have "personal knowledge of the matter."[20] In the State's view, Mr. Killpack relied on the Tovars' declarations instead of his personal knowledge of the situation and therefore any statements about the benefits the Tovars received or the effects therefrom are speculative. The State also argued that Mr. Killpack offers a number of legal conclusions, which are inadmissible under Utah Rule of Evidence 704.

¶125 The district court agreed with the State and sustained the objection for the reasons articulated by the State.

¶126 On appeal, Carter argues that Mr. Killpack's testimony was based on personal knowledge because he has personal knowledge of the Provo Police Department and its employees during the time at issue since he would have interacted with them during his time as a prosecutor. Additionally, Carter argues that, with respect to the State's claim that Mr. Killpack offers legal conclusions, Mr. Killpack's perspective on whether the Tovars' declarations constitute *Brady* material and the effect that material would have had on a jury was germane to the issue before the district court.

¶127 We agree with the district court that the portions of Mr. Killpack's declaration to which the State objects do not appear to be based on personal knowledge. For example, while Mr. Killpack

---

[20] The State did not object to portions of the declaration that offered fact testimony within Mr. Killpack's personal knowledge such as the fact that he was the Utah County Attorney during the relevant times and that he would have disclosed the information about benefits received by the Tovars if he had known about it. Accordingly, the district court did not strike any portion of Mr. Killpack's declaration that the State identified as fact testimony within his personal knowledge.

declares that he is not surprised that the Tovars would receive benefits, he has no personal knowledge of whether the Tovars actually did receive benefits. Instead, he improperly relies on the Tovars' declarations for these foundations. Additionally, his declarations with respect to the information constituting *Brady* material offer improper legal conclusions under rule 704. *See, e.g.,* *Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1347 (Utah 1993) ("[Rule 704] is not intended to allow a witness to give legal conclusions."); *State v. Davis*, 2007 UT App 13, ¶ 15, 155 P.3d 909 ("[O]pinions that tell the jury what result to reach or give legal conclusions continue to be impermissible under rule 704." (citation omitted) (internal quotation marks omitted)). Therefore we conclude that the district court did not abuse its discretion in sustaining the State's objection to Mr. Killpack's declaration.

*Declaration of Dr. Breck Lebegue*

¶128    Carter proffered a declaration from Dr. Breck Lebegue, a psychiatrist who had been retained by Mr. Watson, the prosecutor in Carter's case, to provide a psychiatric evaluation on two defendants in a different capital case. Dr. Lebegue states that he was hired as a confidential psychiatric consultant to opine on issues of competency and mental state defenses. Dr. Lebegue recalls opining that both defendants in that case were incompetent to stand trial and that it has always bothered him that his opinion was never shared with the trial defense counsel because he felt that his opinion was relevant to the defense and the question of competency to stand trial.

¶129    The State argued that Dr. Lebegue's declaration was inadmissible for two reasons. First, the State argues that Dr. Lebegue does not have any personal knowledge of Carter's case generally and the prosecutor's specific conduct in this case. Second, the State argues that any testimony about Mr. Watson's behavior in another case constitutes improper character evidence under Utah Rule of Evidence 404(a), which prohibits the admission of evidence "to prove that on a particular occasion the person acted in conformity with the character or trait" described in the evidence.

¶130    The district court agreed with the State and sustained the objection for the reasons articulated by the State.

¶131    On appeal, Carter argues that Dr. Lebegue possesses personal knowledge about how Mr. Watson handled his disclosure obligations under *Brady*, albeit in a different case. Carter also argues that Dr. Lebegue's declaration is not improper character evidence because "Mr. Watson's adherence to *Brady* is not a question of character, it is a question of his understanding of his legal duties as a

prosecutor." Additionally, Carter argues that the declaration offers important impeachment evidence with regard to the prosecutor's credibility in the event that the State argues that Mr. Watson did not know about the benefits the Tovars received.

¶132 We agree with the district court that Dr. Lebegue's testimony regarding Mr. Watson's behavior in a different case constitutes improper character evidence under rule 404. Carter's assertion that the evidence is offered to demonstrate Mr. Watson's understanding of his legal duties is unavailing because his personal understanding of his duties as a prosecutor is irrelevant to Carter's *Brady* and *Napue* claims.[21] We agree with the district court's finding that the most logical import of Dr. Lebegue's testimony is a desire to demonstrate that Mr. Watson acted in conformity with the character or trait of not disclosing evidence to defendants' counsel and therefore find no abuse of discretion by the district court in sustaining the State's objection. For these reasons, we hold that the district court did not abuse its discretion in sustaining the State's objection to Dr. Lebegue's declaration.

*Declaration of Dr. Mark Cunningham*

¶133 Carter proffered a declaration from Dr. Mark Cunningham, a psychologist hired by Carter's current counsel to provide expert evaluation on factors impacting Carter's confession in 1985 and the Tovars' ability to provide accounts of what Carter told them on the night of the murder. Dr. Cunningham opined that Carter suffered from a number of neuro-cognitive defects at the time of his confession and that "these vulnerabilities rendered him particularly susceptible to coercive pressures and faulty risk/benefit analysis of the consequences of signing a statement." Dr. Cunningham also opined that the Tovars' declarations "provide strong support for a conclusion that both were experiencing

---

[21] Under *Brady*, the relevant inquiry is whether the prosecution suppressed favorable evidence and, if so, whether prejudice ensued. *See supra* ¶¶ 49–53. Under *Napue*, the relevant inquiry is whether the prosecutor failed to correct testimony which he or she knew to be false. *See supra* ¶ 107. In neither inquiry is it required to first establish that the prosecutor knew that he or she had duties under *Brady* or *Napue*. In other words, a *Brady* or *Napue* violation can occur even if the prosecutor is unaware of his or her duties under *Brady* and *Napue*.

significant psychological coercion regarding their statements to police and testimony at the preliminary hearing and trial."

¶134   The State argued that Dr. Cunningham's declaration was irrelevant and therefore inadmissible under Utah Rule of Evidence 402 because it was offered for the sole purpose of supporting a procedurally barred claim: challenging Carter's confession. In the State's view, Dr. Cunningham's declaration had no tendency of making the alleged *Brady* and *Napue* violations more or less likely.

¶135   The district court agreed with the State and sustained the objection for the reasons articulated by the State.

¶136 On appeal, Carter argues that Dr. Cunningham's declaration is relevant to his *Brady* and *Napue* claims. Carter claims that, in the absence of the *Brady* and *Napue* violations, trial counsel would have every reason to more diligently challenge the confession and the Tovars' statements and that Dr. Cunningham's declaration illustrates the type of evidence that Carter's counsel could have presented at trial to lessen the power of the confession.

¶137   The State argues, and Carter seems to agree, that the relevance of the declaration relates to challenging Carter's confession. And while counsel is permitted to explore how trial preparation and strategy would have been different had *Brady* and *Napue* violations not occurred, we disagree with Carter that trial counsel would have had a demonstrably greater reason to challenge the confession. Given the lack of physical evidence in this case, Carter's confession was critical to the prosecution's case. Carter's trial counsel had every reason to lessen the power of the confession. Accordingly, it is irrelevant what types of evidence Carter's trial counsel could have presented at trial to further lessen the power of the confession. For this reason, we agree with the district court's holding that Dr. Cunningham's declaration is irrelevant and inadmissible under rule 402.

*Janet Dowling's Social History Report*

¶138   Carter proffered a social history report prepared by Janet Dowling, a mitigation specialist, in 2003. The report indicates that Carter "faced a multitude of obstacles to healthy development" including racial discrimination, an unsteady home, and drug and alcohol abuse.

¶139   The State objected to the report, arguing that it is irrelevant to the issues raised in Carter's petition and therefore is inadmissible under Utah Rule of Evidence 402.

¶140   The district court agreed with the State and sustained the objection for the reasons articulated by the State.

¶141   On appeal, Carter argues that the report is relevant to the materiality of the *Brady* and *Napue* claims because it undermines the reliability of Carter's confession. Carter also argues that the report provides "additional mitigation" that "must also be factored in to the materiality analysis for the sentencing phase."

¶142   We agree with the district court's holding that Ms. Dowling's report is irrelevant and inadmissible under rule 402. To the extent that the report is used to challenge the confession, this claim is procedurally barred and therefore any evidence supporting that claim is irrelevant and inadmissible for that purpose. Carter's argument that the report provides additional mitigation that must be factored in to our materiality analysis is misguided. Our materiality analysis focuses on whether the outcome of Carter's trial and sentencing would have been different but for the *Brady* and *Napue* violations. Because the report does not constitute *Brady* or *Napue* material, we do not consider it when assessing materiality.

*Declaration of Kevin Kurumada*

¶143   Carter proffered a declaration from Kevin Kurumada, an attorney who worked on an amicus brief for Carter in his first direct appeal and who has had limited in-person interaction with Carter. In his declaration, Mr. Kurumada states that he saw Carter "one time, very briefly" and that his impression was that "Carter had a very low IQ, possibly within the range of mental retardation," informed by his observation that Carter was "monosyllabic in his speech." Mr. Kurumada also declares that he believes Carter's case was a capital case "primarily because the victim was related to the police chief."

¶144   The State argued that Mr. Kurumada's declaration was irrelevant under Utah Rule of Evidence 402. In the State's view, Kurumada's statement about his perception of Carter's intelligence has no tendency to make Carter's *Brady* and *Napue* claims more or less likely. And even if it were relevant, Mr. Kurumada lacked the basis for forming the opinion that Carter had a very low IQ because Mr. Kurumada "had no knowledge of [Carter's] background or education." With respect to the declaration about Carter's case being a capital case, the State argued that this was irrelevant under rule 402 because Mr. Kurumada's personal opinions about the case do not make the viability of Carter's *Brady* and *Napue* claims more or less likely.

¶145 The district court agreed with the State and sustained the objection for the reasons articulated by the State.

¶146 On appeal, Carter argues that Mr. Kurumada's declaration is relevant to the discussion of Carter's susceptibility to coercive interrogation tactics, which Carter claims is relevant because the nature of Carter's confession elevates the importance of the Tovars' testimony and credibility. Additionally, Carter argues that Mr. Kurumada's statement that Carter's case was capital because of the victim's relation to the police chief is relevant because it shows that the police had a motive to "shift blame from [Ms. Olesen's husband] to Carter."

¶147 We agree with the district court that Mr. Kurumada's statements are irrelevant and inadmissible under rule 402. Mr. Kurumada's statement that he thought Carter had a very low IQ is irrelevant for the reasons discussed above, namely that the veracity of Carter's confession is not at issue in this case. While there is no doubt that any questions regarding Carter's confession would elevate the importance of the Tovars' testimony, Carter is now procedurally barred from challenging his confession. Additionally, we agree with the State that Mr. Kurumada's personal opinions about the motives of police and the prosecution are irrelevant to Carter's *Brady* and *Napue* claims.

### *Declaration of Jeffrey J. Hunt*

¶148 Carter proffered a declaration from Jeffrey J. Hunt, an attorney who represented Carter in his first post-conviction case. Mr. Hunt's declaration primarily discussed the financial and expertise limitations that Carter's first post-conviction team faced and explains why certain strategic avenues were not explored. Mr. Hunt also explained how he would have wanted to present the reports prepared by Dr. Cunningham and Ms. Dowling had they been available when he was representing Carter. Mr. Hunt also stated that it is his understanding and belief that Utah's post-conviction funding statute provides insufficient funding to pay for experts and investigators.

¶149 The State argued that Mr. Hunt's declaration did not bear on Carter's *Brady* and *Napue* claims and was therefore irrelevant and inadmissible under rule 402. The State also argued that Mr. Hunt's statements relating to the post-conviction funding statute lack foundation and constitute prohibited lay opinion.

¶150 The district court overruled the State's objection to the extent that the declaration provides support for why Carter did not

bring his claims earlier, but sustained the objection with respect to the remainder of the declaration.

¶151 On appeal, Carter argues that Mr. Hunt's assessment of the usefulness of Dr. Cunningham's and Ms. Dowling's reports is relevant because it shows how Carter may have been susceptible to coercive interrogation tactics. Carter also argues that Mr. Hunt has sufficient knowledge of his own experience to give his opinion of the difficulty of undertaking a complex case with inadequate resources.

¶152 We agree with the district court that the portions of Mr. Hunt's declaration it deemed inadmissible are irrelevant and inadmissible under rule 402. Because Carter's confession cannot be challenged in this appeal, any assessment of the usefulness of Dr. Cunningham's and Ms. Dowling's reports is irrelevant. Additionally, Mr. Hunt's opinion about the lack of funding for experts and investigators in this kind of case is likewise irrelevant beyond being offered for the purpose of demonstrating why Carter did not bring his claims sooner.

*Declaration of Bradley Rich*

¶153 Carter proffered a declaration from Bradley Rich, another attorney who worked on Carter's first post-conviction case. Mr. Rich explains why he felt that he and the attorney he was working with, Jack Morgan, were unable to effectively represent Carter in his post-conviction proceedings. Mr. Rich states that their budget was extremely limited and that Mr. Morgan took charge of the investigation but accomplished very little. In Mr. Rich's view, he and Mr. Morgan should have more thoroughly investigated the case. Mr. Rich declares that he would have included information from the Tovars' declarations had it been known to him at the time they filed Carter's first post-conviction petition. Additionally, Mr. Rich opines that he would have wanted to use the information contained in Dr. Cunningham's and Ms. Dowling's reports to press ineffective assistance of counsel claims.

¶154 The State argued that Mr. Rich's declaration was irrelevant and inadmissible under Utah Rule of Evidence 402 because Carter does not show how it bears on his *Brady* and *Napue* claims. The State also claimed that Mr. Rich's declaration was inadmissible in its entirety because it addresses only his personal views about the adequacy of Carter's post-conviction representation and the value of Dr. Cunningham's and Ms. Dowling's reports.

¶155 The district court overruled the State's objection with respect to the portion providing support for why Carter did not file his claims sooner and how Mr. Rich's representation may have been

different had he known about the information in the Tovars' declarations. The district court sustained the objection with respect to the remainder of Mr. Rich's declaration, finding that it was irrelevant to the substance of Carter's *Brady* and *Napue* claims.

¶156   On appeal, Carter argues that Mr. Rich's declarations are relevant in their entirety because they provide part of the basis for Carter's inability to bring his *Brady* and *Napue* claims in an earlier proceeding. Carter also argues that Mr. Rich is competent to assess what he and his associates should have done when representing Carter.

¶157   We agree with the district court that the portions of Mr. Rich's declaration it deemed inadmissible are irrelevant and inadmissible under rule 402. Carter's first argument regarding the relevance of Mr. Rich's declaration is unavailing because the district court already overruled the objection with respect to those portions that provide support for why Carter did not file his claims earlier. We agree with the district court that the rest of Mr. Rich's declaration is irrelevant to Carter's *Brady* and *Napue* claims. Mr. Rich's opinion of what he should have done differently while representing Carter has no bearing on whether a *Brady* or *Napue* violation occurred and, if so, whether Carter was prejudiced by those violations.

*Declaration of Perla Bermudez*

¶158   Carter proffered a declaration from Perla Bermudez, a friend of Carter and the Tovars. Ms. Bermudez declares that police threatened her with deportation if she did not cooperate with their investigation of Carter. Ms. Bermudez also declares that the Tovars told her that they had been similarly threatened by police with deportation and the loss of their child.

¶159   The State argued that Ms. Bermudez's testimony regarding her experience with police was improper character evidence under Utah Rule of Evidence 404(b), introduced to show that police frequently threatened witnesses with deportation. Additionally, this testimony was irrelevant in the State's view because it does not make the viability of Carter's *Brady* and *Napue* claims any more or less likely. The State also argued that Ms. Bermudez's statements regarding the Tovars constituted inadmissible hearsay under Utah Rule of Evidence 802.

¶160   The district court agreed with the State and sustained the objection on the grounds that testimony about police treatment was impermissible character evidence and statements about the Tovars were inadmissible hearsay.

¶161   On appeal, Carter argues that Ms. Bermudez's declaration is relevant to show that Provo Police used threats of deportation to coerce cooperation from witnesses. Additionally, Carter argues that rule 404 does not apply in this context because Ms. Bermudez's statements do not identify any individual police officer so her statements cannot constitute character evidence.

¶162   We agree with the district court that Carter's admission that the declaration is being offered to show that Provo Police used threats of deportation demonstrates that this evidence is being used as character evidence under rule 404(b). Carter argues that this finding is irrelevant because there is no individual police witness whose character is at issue and therefore rule 404(b) is inapposite. In doing so, Carter presents an interesting question of law: whether rule 404 applies to groups and entities. This appears to be a matter of first impression for this court, and is an unsettled area of law generally. *See*, *e.g.*, 22B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE EVIDENCE § 5234 (2d ed. 2018) ("Only a handful of cases apply the character rules to corporations—often with little or no consideration of the issues raised here. . . . We think it safe to say that as of this writing the proper method of handling issues of corporate character remains an open question." (citation omitted)). But Carter's brief contains only one (tautological) sentence addressing this issue and provides no citation to authority for his position. This is plainly inadequate. Because Carter has not adequately briefed this issue we do not pass on his claim that rule 404 cannot apply here and therefore affirm the district court's ruling on this issue.

¶163   We also agree with the district court that Ms. Bermudez's statements about the Tovars being threatened by police constitute hearsay, as the statements appear to be offered for the truth of the matter asserted and no hearsay exception applies. Because no hearsay exception applies, the district court did not abuse its discretion in granting the State's objection to this testimony.

*Deposition of Wayne Watson and Deposition Exhibits 16-19*

¶164 Carter deposed Wayne Watson, the Utah County prosecutor in the original trial, as part of this post-conviction appeal. The State argued below that portions of the deposition and exhibits 16-19 attached thereto were inadmissible. The district court sustained the objection with respect to certain portions of the deposition transcript and with respect to exhibits 16-19.

¶165   On appeal, Carter recognizes that this evidence is not at issue in this appeal because the district court found a genuine issue

of material fact exists regarding whether Mr. Watson suppressed financial benefits received by the Tovars and knowingly failed to correct false testimony. Accordingly, Carter has not provided briefing arguing that we should reverse the district court's ruling on this evidence. Because Carter has not briefed the issue, we do not reach it and we affirm the district court's holding with respect to this evidence.

## CONCLUSION

¶166 We hold that Carter has demonstrated a genuine dispute of material fact whether he was prejudiced by his *Brady* and *Napue* claims. We therefore reverse and remand for an evidentiary hearing on Carter's *Brady* and *Napue* claims consistent with this opinion. We also affirm the district court's dismissal of Carter's improper vouching claim and its evidentiary rulings as detailed in this opinion.